1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                           EASTERN DISTRICT OF CALIFORNIA

10

11   CITIZENS FOR A BETTER WAY, et al.,          No.  2:12-cv-3021-TLN-AC

12                 Plaintiffs,

13        v.                                      **ORDER**

14   UNITED STATES DEPARTMENT OF
     THE INTERIOR, et al.,

15
                   Defendants.
16

17        This matter is before the Court pursuant to Plaintiff United Auburn Indian Community's

18   ("Plaintiff UAIC") Motion for Summary Judgment (ECF No. 98), Plaintiff Citizens for a Better

19   Way's et al. ("Plaintiff Citizens")[1] Motion for Summary Judgment (ECF No. 99), Plaintiff Cachil

20   Dehe Band of Wintun Indians of the Colusa Indian Community's ("Plaintiff Colusa") Motion for

21   Summary Judgment (ECF No. 102), Defendants'[2] Cross Motion for Summary Judgment (ECF

22   No. 116), and Defendant Estom Yumeka Maidu Tribe of the Enterprise Rancheria's ("Defendant

23   Enterprise") Motion for Summary Judgment (ECF No. 119).

24        I.    **FACTUAL BACKGROUND**

25        This case involves the interrelated actions that Defendants took in connection with a

26   _____

     [1] "Plaintiff Citizens" includes Citizens for a Better Way, Stand Up for California!, Grass Valley Neighbors, William

27   F. Connelly, James M. Gallagher, Andy Vasquez, Dan Logue, Robert Edwards, and Roberto's Restaurant.  (ECF No.
     99.)

     [2] Defendants include the Secretary of the Interior, the Assistant Secretary- Indian Affairs, the Bureau of Indian

28   Affairs, and the Department of the Interior.

                                         1

proposed gaming facility and hotel fee-to-trust acquisition project.  (ECF No. 98-1 at 1.)  The Bureau of Indian Affairs ("BIA") is in charge of reviewing and approving Tribal applications pursuant to the Indian Reorganization Act ("IRA").  In 2002, Defendant Enterprise submitted an application to the BIA requesting that the Department of the Interior ("DOI") accept trust title to a piece of land in Yuba County.  (EN_AR_NEW_0030167.)  Defendant Enterprise plans to build a gaming facility, hotel, and parking facilities on this land in Yuba County ("Yuba Site").  (EN_AR_NEW_0030167.)  The proposed trust acquisition was analyzed in an Environmental Impact Statement ("EIS") prepared under the direction and supervision of the BIA.  (EN_AR_NEW_0030167.)  The BIA analyzed the potential environmental impacts of the proposed trust acquisition.  (EN_AR_NEW_0030171.)  The Draft EIS was issued for public review and comments on March 21, 2008.  (EN_AR_NEW_0030171.)  After the comment period, a public hearing, and consideration and incorporation of comments received, the BIA issued the Final EIS ("FEIS") on August 6, 2010.  (EN_AR_NEW_0030171.)  The BIA issued a Record of Decision ("ROD") in November 2012 finding that a gaming establishment on the Yuba Site would be in the best interest of Enterprise and its members and would not be detrimental to the surrounding community.  (ECF No. 98-1 at 4, EN_AR_NEW_0030166.)

## II. **PROCEDURAL BACKGROUND**

Plaintiff Colusa filed its complaint in this Court on December 14, 2012.  (ECF No. 1 in Case No. 12-1604).  On December 12, 2012, Plaintiff UAIC filed suit in the District of Columbia (D.C. No. 1:12-cv-1988); on December 20, 2012, three local advocacy groups, five local residents, and a local restaurant ( "Plaintiff Citizens") did likewise (D.C. No. 1:12-cv-2052).  The UAIC and Citizens cases were consolidated and transferred to this Court.  On January 23, Citizens/UAIC was consolidated with Colusa as Case No. 2:12-cv-3021.  (ECF No. 40.)  Motions for temporary restraining orders (and, in Colusa's case, for mandamus) were all denied by order dated January 30, 2013.  (ECF No. 57.)  The Yuba Site was taken into trust by the United States on May 15, 2013.

Plaintiff UAIC, Plaintiff Citizens and Plaintiff Colusa each filed their own Motion for Summary Judgment on June 24, 2014.  (ECF No. 98, 99, 102.)  On July 24, 2014, Defendants

1  filed a Motion for Summary Judgment.  (ECF No. 116.)  Defendants Enterprise also filed a

2  Motion for Summary Judgment.  (ECF No. 119.)

3        II.      **STANDARD OF LAW**

4            Summary judgment is appropriate when the pleadings and the record demonstrate that

5  "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

6  matter of law." Fed.R.Civ.P. 56(c).  In this case, the Court's review of Plaintiffs' National

7  Environmental Policy Act ("NEPA"), the Indian Gaming Regulatory Act ("IGRA") and the

8  Indian Reorganization Act ("IRA") claims is governed by the Administrative Procedure Act

9  ("APA").  ").  *See Lujan v. Nat'l  Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990); *ONRC Action v.*

10  *BLM*, 150 F.3d 1132, 1135 (9th Cir. 1998) (NEPA); *Hein v. Capitan Grande Band of Diegueno*

11  *Mission Indians*, 201 F.3d 1256, 1260 (9th Cir. 2000) (IGRA); *McAlpine v. United States*, 112

12  F.3d 1429, 1435 (10th Cir. 1997) (IRA).  Under the APA, a court must set aside any agency

13  action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

14  law" or taken "without observance of procedure required by law."  5 U.S.C. § 706(2).  "[T]he

15  function of the district court is to determine whether or not as a matter of law the evidence in the

16  administrative record permitted the agency to make the decision it did."  *Occidental Engineering*

17  *Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985).  "[S]ummary judgment is an appropriate

18  mechanism for deciding the legal question of whether the agency could reasonably have found

19  the facts as it did."  *Id*. at 770.  The standard is '"highly deferential, presuming the agency action

20  to be valid and affirming the agency action if a reasonable basis exists for its decision.'"  *Nw.*

21  *Ecosystem Alliance v. U.S. Fish & Wildlife Serv*., 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting

22  *Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000).

23        III.     **ANALYSIS**

24        A.   **National Environmental Policy Act Claim**

25            Plaintiff UAIC, Plaintiff Colusa and Plaintiff Citizens all allege that BIA violated the

26  National Environmental Protection Act ("NEPA").  The two objectives of this statute include: (1)

27  placing upon an agency the obligation to consider every significant aspect of the environmental

28  impact of a proposed action; and (2) ensuring that the agency will inform the public that it has

3

considered environmental concerns in its decision-making. *Baltimore Gas & Elec., Co. v. Natural Res. Def. Council,* 462 U.S. 87, 97 (1983). Judicial review of an agency's EIS "under NEPA is extremely limited." *Nat'l Parks & Conservation Ass'n v. U.S. Dep't of Transp.,* 222 F.3d 677, 680 (9th Cir. 2000). "The reviewing court may not substitute its judgment for that of the agency concerning the wisdom or prudence of a proposed action." *Oregon Envtl. Council v. Kunzman,* 817 F.2d 484, 492 (9th Cir. 1987).

In the Motion for Summary Judgment, Plaintiff UAIC claims that Defendants violated NEPA by: (1) narrowing the purpose of the proposed action in order to dismiss viable alternatives; (2) failing to take a "hard look" at UAIC's socioeconomic interests and other interests; and (3) violated NEPA's conflict-of-interest provisions by giving undue weight to one of Enterprise's consultants. (ECF No. 98-1 at 5.) Both Plaintiff Citizens and Plaintiff Colusa further allege that Defendants violated NEPA by not considering an adequate number of alternatives. (ECF No. 99, ECF No. 102.) Finally, Plaintiff Colusa contends that the agency failed to take a "hard look" at the environmental impacts of the proposed casino. (ECF No. 102.) The Court will address each argument below.

### 1. Statement of the Purpose and Need of the Proposed Action

Under NEPA, an agency must state the purpose and need of the proposal it is evaluating. 40 C.F.R. § 1502.13. Agencies enjoy "considerable discretion" to define the purpose and need of a project. *Friends of Southeast's Future v. Morrison,* 153 F.3d 1059, 1066 (9th Cir. 1998). However, in doing so "an agency cannot define its objectives in unreasonably narrow terms." *City of Carmel-By-The-Sea v. United States Dep't. of Transp.,* 123 F.3d 1142, 1155 (9th Cir. 1997). "An agency may not define the objectives of its action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action, and the EIS would become a foreordained formality." *Friends,* 153 F.3d at 1066 (quoting *Citizens Against Burlington, Inc. v. Busey,* 938 F.2d 190, 196 (D.C.Cir. 1991), *cert. denied,* 502 U.S. 994 (1991)) (correction in original). Therefore, in evaluating an agency's statement of purpose, courts apply a reasonableness standard and consider the statutory context of the federal action at issue. *League of Wilderness Defenders*

4

*v. U.S. Forest Serv.*, 689 F.3d 1060, 1070 (9th Cir. 2012.)

Here, the Final Environmental Impact Statement ("FEIS") defines BIA's purpose for acquiring the land in trust as follows:

- Restoring trust land to the Tribe in an amount equal to the amount of land previously lost as a result of federal action.
- Provide employment opportunities for tribal members.
- Improve the socioeconomic status of the Tribe by providing a new revenue source that could be utilized to build a strong tribal government, improve existing tribal housing, provide new tribal housing, fund a variety of social, governmental, administrative, educational, health, and welfare services to improve the quality of life of tribal members, and to provide capital for other economic development and investment opportunities.
- Allow Tribal members to become economically self-sufficient, thereby eventually removing Tribal members from public-assistance programs.
- Fund local governmental agencies, programs and services.
- Make donations to charitable organizations and governmental operations.
- Effectuate the Congressional purposes set out in the Indian Gaming Regulatory Act (IGRA).

(EN_AR_NEW_0023219).

Plaintiff UAIC claims that Defendants defined the purpose and need of Enterprise's proposal so narrowly as to preclude reasonable alternatives.  (ECF No. 98-1 at 5-7.)  Plaintiff UAIC further asserts that the proposal merely focuses on Enterprise's private interests: restoring trust land to Enterprise, permitting Enterprise to conduct Class III gaming, and increasing Enterprise's economic development potential.  (ECF No. 98-1.)  Although the Defendants considered five purported alternatives, Plaintiff UAIC claims that only the Yuba Site fulfilled all the purposes.  (ECF No. 98-1.)  Plaintiff UAIC further contends that one of these five alternatives was not even a true alternative but rather was doomed from the start.[3]  (ECF No. 98-1.)  Plaintiff UAIC argues that the proposed alternatives were not varied enough to allow for a real, informed choice.  *See Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1039 (9th Cir. 2008).

As stated in 25 U.S.C. § 2701, some of the principal goals of "Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government."  25

---

[3] One of the alternatives, Alternative D, proposed a development of drastically reduced scale that would result in very little profits and was therefore not economically feasible.  (ECF No. 98-1.)

U.S.C. § 2701(4).  Defendants argue that their purpose fits within this statutory context.  (ECF No. 116-1 at 33.)  Furthermore, Defendants disagree with Plaintiff's argument that the purposes were so narrow that only the Yuba Site fulfilled all the purposes.  (ECF No. 116-1 at 33.)  The FEIS studied the likely benefits of Alternative A (the Yuba site casino) and Alternative C (a water park complex).  (EN_AR_NEW_24792-24794.)  Although both alternatives meet the stated purposes, Defendants argue that Alternative A is superior because it will provide much greater revenue and additional employment.  (ECF No. 116-1 at 33.) (EN_AR_NEW_0023649-0023650).  Defendants conclude that BIA's statement of purpose and need easily withstands scrutiny.  *See HonoluluTraffic.com v. Federal Transit Admin.*, 742 F.3d 1222, 1231 (9th Cir. 2014) ("Because the statement of purpose and need did not foreclose all alternatives, and because it was shaped by federal legislative purposes, it was reasonable") (citation and internal quotation marks omitted).  (ECF No.116-1 at 34.)

Since the purpose was defined in accordance with the goals dictated by Congress in 25 U.S.C. § 2701(4), it complies with the relevant statutes and is not so narrowly defined that only one alternative would fulfill all the purposes.  Therefore, the Court concludes that the stated purpose is reasonable.

### 2.   Consideration of Alternatives to the Proposed Action

NEPA requires that an EIS discuss alternatives to the proposed action.  42 U.S.C. § 4332(2)(c).  "An agency must look at every reasonable alternative, with the range dictated by the nature and scope of the proposed action, and sufficient to permit a reasoned choice."  *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison,* 67 F.3d 723, 729 (9th Cir. 1995) (internal citations and quotation marks omitted).  An agency must consider "enough alternatives to permit a reasoned choice," but does not need to consider every available alternative.  *Pacific Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1100 (9th Cir. 2012).  An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a).

Plaintiff Citizens argues that Defendants did not consider an adequate number of alternatives (they only reviewed two locations in detail).  (ECF No. 99-1 at 19.)  Furthermore,

1   Plaintiff Citizens alleges that Defendants arbitrarily dismissed reasonable alternatives from

2   consideration.  (ECF No. 99-1 at 19.)  Plaintiff Citizens explains that Defendants did not consider

3   Highway 65, Highway 99, and Highway 162 as alternatives because they lacked infrastructure.

4   (ECF No. 99-1 at 19, EN_AR_NEW_0023392.)  However, Plaintiff Citizens claims that the Butte

5   County alternative, which Defendants did consider, also lacked infrastructure.  (ECF No. 99-1 at

6   19.)  Plaintiff Citizens provides an additional example of Highway 99 and 162 which Defendants

7   also refused to consider in detail because the sites contained "numerous biologically sensitive

8   resources."  (ECF No. 99-1 at 19.)  However, Plaintiff Citizens points out that the Yuba site has

9   the same resources, including emergent wetlands, intermittent channels, and a riparian corridor.

10  (ECF No. 99-1 at 19.)  Plaintiff Citizens provides additional examples to suggest that Defendants'

11  elimination of alternatives was arbitrary.  (*See* ECF No. 99-1 at 19.)  However, similar to those

12  discussed above, the Court does not find these arguments persuasive.  Defendants reasoned that

13  Alternative A was the superior site because it provides much greater revenue and additional

14  employment.  (ECF No. 116-1 at 33.).  Although the Yuba site may share some similarities with

15  alternatives that were dismissed, Plaintiff Citizens has not established that Defendants were

16  arbitrary or that Defendants did not . . .  "[r]igorously explore and objectively evaluate all

17  reasonable alternatives" pursuant to 40 C.F.R. § 1502.14(a).

18         Plaintiff Colusa argues that the identified alternatives "stacked the deck in favor of

19  Alternative A, undermining the action-forcing purpose of NEPA."  (ECF No. 102-1 at 8.)

20  Plaintiff Colusa claims that the FEIS ignored logical alternatives and failed to address a suitable

21  range of alternatives by restricting itself to only two locations.  (ECF No. 102 at 9.)  Plaintiff

22  Colusa contends that the statement of Purpose and Need required building a casino, which limited

23  the choice to Alternatives A and D[4].  (ECF No. 102-1 at 8.)  Furthermore, the Purpose and Need

24  requires generating revenue, which the larger casino alternatives met.  (ECF No. 102-1 at 9.)  As

25  a result, Alternative A which included a large casino on the Yuba site, was automatically favored.

26  (ECF No. 102-1 at 9.)  Plaintiff Colusa therefore argues that the FEIS did not seriously propose

27  any other alternative casino locations for consideration.  (ECF No. 102-1 at 9.)  Ninth Circuit case

28  ───────────────
[4] Alternatives B and C were discarded because they would not meet the need to build a casino.

law provides that the "existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Alaska Wilderness Recreation & Tourism v. Morrison*, 67 F. 3d 723, 729 (9th Cir. 1995) (internal citations and quotation marks omitted).

Plaintiff UAIC also argues in their Motion for Summary Judgment that Defendants rejected viable alternatives.  (ECF No. 98 at 5.)  Plaintiff UAIC states that BIA defined the purpose and need of Enterprise's proposal very narrowly, resulting in only one alternative that accomplished the purpose: transferring the Yuba Site into trust for Enterprise.  (ECF No. 98 at 5.) Plaintiff UAIC suggests that Defendants did not independently evaluate the other sites, and therefore the EIS is inadequate.  (ECF No. 98-1 at 7.)

In response to Plaintiffs' argument, Defendants maintain that multiple sites were considered.  (ECF No. 116-1 at 46.)  In the end, four sites (that would have to be taken into trust) were given "serious consideration," as well as the alternative of no-action at all.  (ECF No. 116-1 at 46, EN_AR_NEW_0023392-0023393.)  Defendants responded specifically to the various issues Plaintiffs had with BIA's rejection of the alternatives.  (ECF No. 116-1 at 46.)

Defendant Enterprise also responded in a Motion for Summary Judgment.  (ECF No. 119-1 at 21.)  Defendant Enterprise contends that the various alternatives included different sites, different types of development (including both gaming and non-gaming development options), different development intensities, and the alternative of taking no action at all.  (ECF No. 119-1 at 21.)  Defendant Enterprise argues that although Plaintiffs may have preferred another alternative, such a preference is "simply not grounds for finding that the agency failed to meet its obligations…or that the agency's decision was arbitrary and capricious." *City of Roseville v. Norton*, 219 F. Supp. 2d 130, 170 (D.D.C. 2002) *aff'd* 348 F.3d 1020 (D.C. Cir. 2003) and *cert denied* 541 U.S. 974 (2004) (internal citations and quotation marks omitted).

Defendants further point out that none of the Plaintiffs provided any additional alternatives that should have been considered.  (ECF No. 116-1 at 50.)  A plaintiff must make some showing that feasible alternatives exist. *Olmsted Citizens for a Better Community v. U.S.,* 793 F.2d 201, 209 (8th Cir. 1986), *citing  Roosevelt Campobello International Park Commission v. United States Environmental Protection Agency,* 684 F.2d 1041, 1047 (1st Cir. 1982) ("In order

8

to preserve an alternatives issue for review, it is not enough simply to make a facially plausible suggestion; rather, an intervenor must offer tangible evidence that an alternative site might offer 'a substantial measure of superiority' as a site.")  Plaintiffs do not make a showing that additional viable or logical alternatives exist, or that the three other alternative sites were substantially superior.  The Court notes that an agency is not required to consider speculative possibilities. Therefore, given that Plaintiffs did not provide any additional alternatives, the Court cannot presume that an adequate alternative exists somewhere.  Without anything further from Plaintiffs, the Court cannot conclude that Defendants failed to look hard enough to find a superior site. Therefore, the Court concludes that Defendants considered a reasonable number of alternatives.

As for evaluation of alternatives, an agency is required to examine "only those alternatives necessary to permit a reasoned choice." *Association of Pub. Agency Customers, Inc. v. Bonneville Power Admin.,* 126 F.3d 1158, 1185 (9th Cir. 1997).  Here, the BIA considered four different sites, which varied in many respects.  Three of the alternatives were rejected for reasons that the Court does not deem arbitrary, but rather convincing.  It appears that Plaintiffs' disagreement here is a substantive one.  The Court does not find this to be sufficient grounds for finding that the BIA failed to follow NEPA procedures.  The Court concludes that the BIA fulfilled its obligation under NEPA to "rigorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14.  Thus, Plaintiff Colusa's contention that Defendants did not seriously propose any other locations and Plaintiff UAIC's contention that Defendants rejected viable alternatives are each without merit.

>    3.   *Violation of NEPA's Conflict-of-Interest Provisions and BIA's Oversight of the*
>         *Preparation of the EIS*

Plaintiff UAIC and Plaintiff Colusa argue in their Motions for Summary Judgment that the FEIS was prepared in violation of the conflict-of-interest provisions of NEPA and that BIA did not adequately participate in or oversee the preparation of the EIS.  (ECF No 98 at 7, ECF No. 102-1 at 12.)

Plaintiff UAIC alleges that Enterprise (the project proponent) selected and controlled the third-party consultant that prepared the Final EIS.  (ECF No. 98-1 at 7.)  The party that drafted

the EIS was Analytical Environmental Services ("AES"), a private company under contract with Enterprise.  (ECF No. 1 at ¶29.)  Enterprise and AES had a relationship before the EIS was prepared.  (ECF No. 98-1 at 7.)  In 2002, AES and Enterprise entered into a Consulting Services Agreement which provided that Enterprise would pay AES $65,000 to prepare the Environmental Assessment ("EA").  (ECF No. 98-1 at 7, ECF No. 117.)  The BIA later adopted the EA that AES prepared with little substantive changes.  (ECF No. 98-1 at 7.)

Plaintiff UAIC argues that the potential for Enterprise and AES to manipulate the process was high, and yet Defendants did not independently investigate the patent and pervasive conflicts of interest.  (ECF No. 98-1 at 7.)  Plaintiff suggests that these conflicts of interest compromised the objectivity of the NEPA analysis and had a material impact on the Final EIS, and therefore the EIS should be vacated.  (ECF No. 98-1 at 7.)  Plaintiff UAIC further contends that AES failed to provide a disclosure statement providing that it had "no financial or other interest in the outcome of the project."  40 CFR 1506.5(c).  Plaintiff Colusa joins the argument by contending that Defendants failed to remain skeptical of the project proponents' claims and failed to neutrally evaluate the impacts of the proposed casino.  (ECF No. 102-1 at 12.)  Plaintiff Colusa suggests that because AES also agreed to "assist with obtaining permit approvals necessary to construct the project," this created a conflict of interest.  (ECF No. 102-1 at 12.)

Defendants respond by arguing that BIA met all three requirements of the relevant regulation, 40 C.F.R. section 1506.5(c).  The first requirement is that the contractor be chosen by "the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest."  40 C.F.R. 1506.5(c).  The contract provides that "AES is the environmental consulting firm that BIA selected in accordance with 40 C.F.R. section 1506.5(c)."  (ECF No. 116-1 at 45.)  Since BIA was the lead agency, under 40 C.F.R. section 1506.5(c), it was permitted to choose AES, and Plaintiffs argument to the contrary is unavailing.

The second requirement demands that contractors execute a disclosure statement specifying that "they have no financial or other interest in the outcome of the project."  40 C.F.R. 1506.5(c).  Here, AES satisfied the second requirement by indicating that it had "no financial

10

1    interest in the results of the environmental analysis or the BIA's decision regarding the approvals

2    for the project." (ECF No. 116-1, EN_AR_NEW_0002396.) Finally, the third requirement states

3    that "the responsible Federal official shall furnish guidance and participate in the preparation and

4    shall independently evaluate the statement prior to its approval." 40 C.F.R. 1506.5(c).

5    Defendants explain that BIA did manage and oversee AES's work. Defendants claim that BIA

6    assisted AES in preparing the original Environmental Assessment. (EN_AR_NEW_0030217.)

7    Furthermore, BIA conducted the initial NEPA scoping hearing, and received written scoping

8    comments. (EN_AR_NEW_0030173.) According to the contract with AES, BIA was to provide

9    AES the technical direction, review, and quality control for the preparation of the Scoping Report,

10   EIS, technical studies, and other NEPA related documents. (ECF No. 116-1 at 47,

11   EN_AR_NEW_0002397.) While the Court does note the minimal nature of BIA's participation,

12   the Court does not consider this to be sufficient to conclude Defendants acted arbitrarily and

13   capriciously.

14        Additionally, Defendants argue that the prospect of providing assistance does not rise to

15   the level of a conflict of interest. (ECF No. 116-1 at 57.) Under the Council on Environmental

16   Quality's NEPA Regulations, the terms "financial or other interest" are interpreted to include "a

17   promise of future construction or design work on the project, as well as indirect benefits the

18   consultant is aware of." 46 F.R. 18031, March 23, 1981. The Court does not consider agreeing

19   to assist with permitting matters to meet this interpretation of "financial or other interest."

20   Therefore, the Court is not convinced that this constitutes a conflict of interest.

21            *4. Failure to take a Hard Look at Consequences*

22        NEPA forces agencies to take a "hard look" at various consequences a proposed action

23   may have. *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002).

24   Consequences may include: "ecological. . . aesthetic, historic, cultural, economic, social, or

25   health." 40 C.F.R. §1508.8. Plaintiff UAIC and Plaintiff Colusa contend that Defendants failed to

26   take a hard look at the following significant consequences of Enterprise's proposal: the impacts

27   on the UAIC's socioeconomic interests (ECF No. 98-1 at 10), the environmental impacts of the

28   proposed casino (ECF No. 102-1 at 10), and impacts on the UAIC's other interests (ECF No. 98-1

11

at 12).  The Court concludes that the BIA conducted a reasoned evaluation of the relevant information and reached a decision that was not arbitrary and capricious.

### a.   Impacts on the UAIC's Socioeconomic Interests

Plaintiff UAIC operates the Thunder Valley Casino, which is 20 miles away from the proposed casino site.  (ECF No. 98-1 at 10.)  Plaintiff UAIC argues that Defendants downplayed the harm that the planned casino will have on UAIC.  (ECF No. 98-1 at 10.)  Plaintiff UAIC claims that Defendants based their assertions on a study prepared by AES which includes factual findings that disprove the conclusions on which Defendants relied.  (ECF No. 98-1 at 10.)  For example, the study projected that Thunder Valley's revenues would "experience the greatest levels of decline" and would "absorb nearly 2/3 of the drop in revenue" among all competitors. (ECF No. 98-1 at 11.)  Plaintiff UAIC explains that this drop in revenue would equate to $30.6 million and is "no drop in the bucket."  (ECF No. 98-1 at 11.)  However, despite these factual findings, Defendants concluded that UAIC would suffer only a "nominal impact" and that their loss in revenue would be "arguably negligible."  (ECF No. 98-1 at 10–11.)

Defendants argue that there is no law that gives Plaintiffs immunity from economic competition, and further contend that Plaintiffs' protests are overblown.  (ECF No. 116-1 at 50.) Defendants stress that Plaintiff UAIC's casino's "base case" revenue is $22,078,228, resulting in a projected revenue reduction of 13.8%.  (ECF No. 116-1 at 41, EN_AR_NEW_0024810.) Defendants argue that the UAIC's casino will remain quite profitable even if a new casino enters the market.  (ECF No. 116-1 at 42.)

Defendants further argue that NEPA does not protect purely economic interests.  *Ashley Creek Phosphate Co. v. Norton*, 420 F.3d 934, 940 (9th Cir. 2005).  As indicated in the record by the Secretary, "competition. . . . is not sufficient, in and of itself, to conclude [there would be] a detrimental impact on" UAIC.  (EN_AR_NEW_0029817; *see also Stand Up for California v. U.S. Dep't of the Interior,* 919 F. Supp.2d 51, 76 (D.D.C. 2013) (finding that where a proposed gaming facility "would result in the [competing tribe] having a smaller slice of a larger gaming pie," but the competition would not jeopardize the competing casino's viability, "the Secretary was likely rational in concluding that such competition would not be significantly detrimental" to

1  the competing tribe)).  Here, Plaintiff UAIC indicates that the drop in revenue would be "no drop

2  in the bucket," however there is no indication that this planned casino would jeopardize the UAIC

3  casino's viability.  Additionally, Plaintiff UAIC did not offer any competing economic analysis to

4  undercut the BIA's analysis, nor did Plaintiff UAIC offer any compelling economic analysis to

5  support its claim of negative economic impact.  (ECF No. 116-1 at 42, fn. 30.)  The Court finds

6  no reason to question BIA's reliance on the conclusions drawn from the consultant's analysis.

7  Furthermore, the Court agrees with the Secretary's statement in the record that competition alone

8  is not enough of a detrimental impact to sustain this NEPA challenge.

9        Plaintiff UAIC and Plaintiff Colusa further argue that the AES study that Defendants

10  relied on was completed in 2006.  (ECF No. 98-1 at 11, ECF No. 102-1 at 10.)  Plaintiff UAIC

11  argues that this study was outdated and unreliable given that it was completed prior to the

12  nationwide recession which began in 2007.  (ECF No. 98-1 at 11).  Therefore, Plaintiffs argue

13  that the analysis is stale because it did not factor in the recession.  The Ninth Circuit has held that

14  relying on stale data during an environmental impact analysis does not constitute the "hard look"

15  required under NEPA.  *Northern Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d

16  1067, 1086–87 (9th Cir. 2011).  However, as Defendants explain, the United States Supreme

17  Court has indicated that supplemental NEPA analysis is only required where there "are significant

18  new circumstances or information relevant to environmental concerns and bearing on the

19  proposed action or its impacts."  *Marsh v. Oregon Nat. Res. Council,* 490 U.S. 360 (1989)

20  (*quoting* 40 CFR § 12 1502.9(c) (1987).  This Court fails to see how the failure to factor the

21  nationwide recession data into the environmental impact analysis has any relevance to

22  environmental concerns and bearing on the proposed action or its impact.  Simply put, Plaintiffs

23  do not make a compelling argument that they are relevant.  The Court concludes that it was not a

24  clear error of judgment for the BIA not to perform a supplemental NEPA analysis.

25        b.  *Environmental Impacts*

26        Plaintiff Colusa notes that pursuant to NEPA, Defendants were required to take a "hard

27  look" at the impacts of the planned casino, including "considering all foreseeable direct and

28  indirect impacts" and a "discussion of adverse impacts that does not improperly minimize

13

1   negative side effects." *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F. 3d 969, 975 (9th Cir. 2006)

2   (quoting *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 963 (9th Cir. 2002)).

3       Plaintiff Colusa suggests that the planned casino poses a danger to six fish species, five of

4   which are listed under the Endangered Species Act.  (ECF No. 102-1 at 11.)  Plaintiff Colusa

5   explains that although the FEIS acknowledges the fish species and the various waterways that

6   surround the property, the FEIS does not consider the effect the proposed casino will have on the

7   fish.  (ECF No. 102-1 at 11.)  The Court notes that Plaintiff Colusa provided no facts to support

8   these speculations.  Furthermore, the FEIS indicates that the fish species "do not have the

9   potential to occur within the study area, as the only aquatic habitats within the study area are

10  agricultural irrigation ditches and canals or receive water supply from these ditches or canals."

11  (EN_AR_NEW_0023554.)  Finally, as Defendants indicate in their Motion for Summary

12  Judgment, the BIA formally consulted under the Endangered Species Act with the U.S. Fish and

13  Wildlife Service, and there was no concern indicated about any fish species.  (ECF No. 116-1 at

14  43, EN_AR_NEW_0024419, 0024454-0024459.)  Therefore, the Court finds that Defendants

15  properly analyzed environmental impacts under NEPA, and Plaintiff Colusa's argument to the

16  contrary fails.

17          c.   *Other interests*

18       Plaintiff UAIC argues that the proposed casino will affect the UAIC's environmental,

19  aesthetic, and historic interests.  (ECF No. 98-1 at 12.)  For example, Plaintiff UAIC contends

20  that the light pollution will irreparably interfere with the UAIC's viewshed of the Sutter Buttes,

21  which have cultural and spiritual significances.  (ECF No. 98-1 at 12.)  Furthermore, the

22  increased air pollution and traffic will affect UAIC members who gather natural resources in the

23  area for cultural practices.  (ECF No. 98-1 at 12.)  Plaintiff UAIC claims that NEPA regulations

24  mandate consideration of "historic" impacts.  40 C.F.R. § 1508.8.  Although Defendants allude to

25  mitigation measures, Plaintiff UAIC suggests that no mitigation measures could actually protect

26  the UAIC's historical connection to the Yuba Site, because once the casino is built, the UAIC's

27  connection to the site will be destroyed.  (ECF No. 98-1 at 13.)

28       Plaintiff UAIC failed to raise this argument regarding cultural practices and the viewshed

14

1  during the NEPA process.  (EN_AR_NEW_0028533-34.)  "Persons challenging an agency's

2  compliance with NEPA must 'structure their participation so that it … alerts the agency to the

3  [parties'] position and contentions,' in order to allow the agency to give the issue meaningful

4  consideration."  *Department of Transp. v. Public Citizen*, 541 U.S. 752 (2004) (*citing Vermont*

5  *Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 553 (1978)).

6  Failure to raise an issue with an agency during the NEPA process precludes judicial review.

7  *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F. 3d 957, 965 (9th Cir. 2002) ("Since the

8  Forest Service was not given notice of this claim sufficient to allow it to resolve the claim, the

9  claim was not properly exhausted and is not subject to judicial review.")  Therefore, they waived

10  this argument at that time.  Furthermore, as Defendant Enterprise points out, the argument relies

11  on an extra-record affidavit from Marcos Guerrero.  (ECF No. 119 at 17.)  The Court issued an

12  order to have this affidavit stricken.  (ECF No. 158.)  The Court finds the BIA performed a proper

13  analysis of the relevant impacts that were raised during the NEPA process.

14        Plaintiff Citizens also argues that the BIA failed to address the fact that part of the Yuba

15  Site is located in a floodplain.  (ECF No. 99-1 at 19.)  Following Executive Order ("EO") 11988,

16  an agency must provide a detailed evaluation of impacts to such areas, as well as consideration of

17  alternatives where floodplains would not be affected.  *See* 42 Fed. Reg. 26951 (1977).  First,

18  Defendants claim that this argument has been waived because none of the participants invoked

19  EO 11988 in response to the EIS.  *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965

20  (9th Cir. 2002).  The Ninth Circuit applies the exhaustion requirement to EO 11988 claims.

21  *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 849 (9th Cir. 2013).  Furthermore, the

22  agency found that each of the alternatives proposed were impractical.  (EN_AR_NEW_0023219-

23  0023220.)  Therefore, the requirements of EO 11988 were satisfied.  (ECF No. 116-1 at 42.)

24  Finally, Defendants claim that they extensively considered floodplain issues and required that

25  floodplain impacts be avoided.  (ECF No. 116-1 at 43 (*See* EN_AR_NEW_0023600 discussing

26  floodplain issues in the FEIS.)  The Court finds that the BIA properly addressed floodplain issues

27  and did not fail to comply with EO 11988.

28  //

### B. Indian Gaming Regulatory Act Claim

Plaintiffs argue that Defendants violated the Indian Gaming Regulatory Act ("IGRA"). The IGRA was enacted to regulate gaming operations owned by Indian tribes. (ECF No. 116-1 at 3.) The IGRA generally prohibits gaming on lands acquired in trust after 1988, unless it fits an exception under 25 U.S.C. § 2719(a) and (b). These exceptions are implemented through regulations found in 25 C.F.R. § 292. Another type of exception, known as the "Secretarial Determination", provides tribes a limited opportunity to conduct gaming where circumstances warrant. (EN_AR_NEW_0028551.) The Secretarial Determination exception provides the following:

> [T]he Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination

25 U.S.C. § 2719 (b)(1)(A). Under this exception, after the Secretary consults with the proper State and local officials, and the officials of nearby Indian tribes, the Secretary will then consider all information provided and make a "Secretarial Determination." 25 C.F.R. § 292.19. Gaming may be permitted if the Secretarial Determination finds as follows: (1) that the proposed site is in the best interest of the tribe; (2) that the proposed site is not detrimental to the surrounding community (25 C.F.R. § 292.21); and (3) after the Secretary receives concurrence from the Governor of the affected state (25 C.F.R. § 292.22).

In this case, on September 1, 2011, the Assistant Secretary of Indian Affairs determined that gaming on the proposed Yuba site would be in the best interest of the Tribe and its citizens and would not be detrimental to the surrounding community. (ECF No. 116-1 at 1.). In addition, the Governor concurred with this determination in a letter dated August 30, 2012. (ECF No. 116-1 at 1.

//

//

//

16

*1. The Secretary Properly Consulted with the Appropriate Officials of Nearby Indian Tribes*

Under the IGRA, the Secretary must consult with "nearby Indian tribes." 25 U.S.C. § 2719(b)(1)(A); 25 C.F.R. § 292.19(a)(2). "Nearby Indian tribe" is defined as "an Indian tribe with tribal Indian lands located within a 25-mile radius of the location of the proposed gaming establishment, or, if the tribe has no trust lands, within a 25-mile radius of its government headquarters." 25 C.F.R. § 292.2. As for Indian tribes located beyond the 25-mile radius, a tribe may "petition for consultation if it can establish that its governmental functions, infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment." 25 C.F.R. § 292.2

Plaintiff Colusa alleges that Defendants failed to consult with them as required by the IGRA. (ECF No. 102-1 at 13.) Plaintiff Colusa claims that in 2009, Colusa requested in writing that BIA consult with it concerning the impacts on the tribe of the proposed fee to trust acquisition. (ECF No. 102-1 at 13.) Plaintiff Colusa states that the BIA refused their request and instead told Colusa to submit comments along with the rest of the public. (ECF No. 102-1 at 13.) Plaintiff Colusa claims that the ROD ignored Colusa and found UAIC to be the only "nearby Indian tribe." (ECF No. 102-1 at 13.)

In response, Defendants point to a letter dated June 23, 2009, where Plaintiff Colusa acknowledged that it was located over 25 miles from the Yuba Parcel. Defendants defend the 25 mile radius as appropriate because:

> Based on our experience, a 25-mile radius best reflects those communities whose governmental functions, infrastructure or services may be affected by the potential impacts of a gaming establishment. The 25-mile radius provides a uniform standard that is necessary for the term 'surrounding community' to be defined in a consistent manner. We have, however, included a rebuttable presumption to the 25-mile radius. A local government or nearby Indian tribe located beyond the 25-mile radius may petition for consultation if it can establish that its governmental functions, infrastructure or services will be directly, immediately and significantly impacted by the proposed gaming establishment.

(ECF No. 116-1 at 28.) Defendants admit that they did receive a letter from Plaintiff Colusa in June 2009; however, Defendants explain that they invited Plaintiff to petition for consultation by

submitting "documents that establish" tribal eligibility in accord with the regulatory definition of "surrounding community." (ECF No. 116-1 at 28.)  Plaintiff Colusa chose not to do so. (ECF No. 116-1 at 28.)

The Court finds that Defendant's decision to use a 25 mile radius was not arbitrary and capricious.  Defendants provided a reasonable explanation in choosing this radius, and allowed a means for tribes outside this radius to petition to be consulted.  Plaintiff Colusa chose to not file a petition.  Therefore, Defendants did not arbitrarily and capriciously fail to consult with Plaintiff Colusa since they were outside the 25 mile radius.

As for Plaintiff UAIC, although they were not initially consulted as a nearby tribe, Plaintiff concedes this was rectified when they were granted a 60 day period to submit comments required by the regulations. (ECF No. 98-1 at 14–15.)  However, Plaintiff UAIC argues that their comments were given little consideration. (ECF No. 98-1 at 15.)  Defendants counter by pointing out that Plaintiff UAIC received specific consideration in the IGRA Record of Decision. (EN_AR_NEW_0029817-18 (considering impact on UAIC's gaming facility, historical ties to the parcel to be taken in trust, and potential negative environmental impacts); EN_AR_NEW_29818 (addressing UAIC's historical connection with the trust parcel); EN_AR_NEW_29812 (characterizing UAIC's comments).)

Additionally, Plaintiff UAIC asserts that the DOI should have initiated a new consultation with the UAIC when Enterprise amended its application or when it supplemented its amended request. (ECF No. 98-1 at 15.)  Plaintiff UAIC simply points to 25 C.F.R. §§ 292.16–19 which provide regulations for the contents of an application and regulations regarding the consultation process.  Plaintiff UAIC does not indicate any IGRA regulations which require a repeat of the consultation process when a tribe updates or supplements its application.

The record reflects that Plaintiff UAIC's comments were given ample consideration.  Furthermore, the Court is unaware of any regulations requiring that the consultation process begin anew when an application is updated or supplemented.  Therefore, the Court finds that nearby Indian tribes, namely the UAIC, were given proper consultation.

2.  *The Secretary Properly Determined that Gaming on the Proposed Yuba site Would be in the Best Interest of the Tribe*

The ROD indicates that the Secretary found the proposed development to be in the best interest of the Tribe and its members.  (EN_AR_NEW_0029814.)  The ROD explains that the development here would likely result in significant increase in the funds available to the Tribe's government.  (EN_AR_NEW_0029814.)  The ROD specified that this increase in revenue will allow the tribe to expand the services delivered by the tribal government, and would result in additional employment opportunities.  (EN_AR_NEW_0029814.)  This new revenue would permit the Tribe to acquire a land base on which to consolidate a tribal community and could allow the tribe to invest in other ventures and diversify its economy.  (EN_AR_NEW_0029814.)  Finally, the ROD also projects benefits to the Tribe and its members from tourism.  (EN_AR_NEW_0029795.)  The Court concludes that the Secretary properly determined that the gaming facility would be in the best interest of the tribe.

3.  *The Secretary Properly Determined that Gaming on the Proposed Yuba Site Would not be Detrimental to the Surrounding Community*

Plaintiff UAIC argues that Defendants' finding of no detriment to the surrounding community was arbitrary and capricious.  (ECF No. 98-1 at 15.)  Similarly, Plaintiff Citizens argues in its motion for Summary Judgment that Defendants' assessment of the various impacts of the proposed construction was arbitrary and capricious.  (ECF No. 99-1 at 12.)

a.  *The Secretary's "no detriment" determination*

Plaintiff Citizens claims that the Secretary's "no detriment" determination is invalid because it is based on an arbitrary and capricious assessment of impacts.  (ECF No. 99-1 at 12.)  Plaintiff Citizens further contends that "the Secretary cannot make a finding of 'no detriment' unless she knows that impacts will be mitigated, and she cannot know that here because she cannot enforce the mitigation."  (ECF No. 99-1 at 14.)  Plaintiff Citizens points to the EIS which provided that the proposed casino would have detrimental impacts, including traffic, air emissions and flood control.  (ECF No. 99-1 at 12–13.)  However, the ROD indicates that the mitigation measures provided would ensure a less than significant impact.  (EN_AR_NEW_0029770.)

Plaintiff Citizens failed to provide any legal authority to support the argument that there

can be no finding of "no detriment" unless the Secretary knows that all impacts will be mitigated.

(ECF No. 116-1 at 18.)  Furthermore, Defendants cite to *Stand Up for California! v. U.S. Dept. of the Interior* where the court decided to "confer significant deference to the Secretary's expertise." *Stand Up*, 919 F.Supp.2d 51, 72 (D.D.C. 2013).  The court in *Stand Up* further concluded that:

> the IGRA does not require that a new gaming development be completely devoid of any negative impacts. . . . All new commercial developments are bound to entail some costs, but the Secretary's duty under the IGRA is to determine whether those costs will be significant enough to be detrimental to the surrounding community.

*Stand Up*, 919 F.Supp.2d 51 at 73.

This Court agrees with the reasoning in *Stand Up* that some costs are inevitable and precluding such new gaming establishments entirely would conflict with the overall intent of the IGRA.  The Court acknowledges that this planned casino will have some negative impacts; however this is not the question posed to the Secretary.  The Secretary must determine whether the project will be detrimental to the surrounding community.  Here, the Secretary concluded that the proposed casino would not be detrimental.  The Court notes that competition alone from the proposed gaming facility in an overlapping gaming market is not sufficient to conclude that it would result in a detrimental impact on UAIC.  The Court concludes that the Secretary considered the impacts of this proposed casino, and therefore considered what was required under the IGRA.  Given the Secretary's expertise, the Court confers deference to the Secretary's decision.

### b. Impact on UAIC's cultural and historic interests

Plaintiff UAIC attacks the Secretary's finding of no detriment by arguing that Defendants failed to adequately acknowledge the irreparable impact that the casino construction would have on the UAIC's cultural and historical interests.  (ECF No. 98-1 at 15.)  Plaintiff UAIC argues that Defendants attempted to minimize the UAIC's interest by claiming that the UAIC's connection with the proposed site was not "exclusive" and therefore UAIC should not suffer any detrimental impact from the construction of the casino.  (ECF No. 98-1 at 15.)  Plaintiff claims that this reasoning is arbitrary and capricious because the construction will threaten UAIC's cultural and

1  historic interests, whether or not their connection is exclusive or not.  (ECF No. 98-1 at 15.)

2  Plaintiff UAIC explains that once the Yuba Site is in trust, Enterprise will be allowed to exercise

3  tribal sovereign powers over Indian lands.  (ECF No. 98-1 at 15.)  Plaintiff argues that this in turn

4  will eradicate the UAIC's cultural and historical ties to the site.  (ECF No. 98-1 at 15.)

5          In the ROD, the Department addresses UAIC's historical connection to the area

6  surrounding the proposed site.  (EN_AR_0029810.)  The ROD claims that UAIC did not present

7  any specific evidence that is sufficient to demonstrate that it has an exclusive significant historical

8  connection to the site.  (EN_AR_NEW_0029810.)  The ROD further explains that even if UAIC

9  presented additional evidence suggesting a stronger historical connection to the Site, "it has not

10  submitted any concrete evidence, nor provided any analysis, indicating that the Tribe's proposed

11  class III gaming facility would have a detrimental impact on its own community as a result."

12  (EN_AR_NEW_0029818.)

13          The Court agrees with Plaintiff that the exclusivity of Plaintiff UAIC's historical

14  connection is not determinative of whether or not the proposed casino will be detrimental to the

15  tribe.  However, it appears that there is not sufficient evidence to indicate that the new gaming

16  facility will have a detrimental impact on Plaintiff UAIC's historical connection.  The Court is

17  not convinced that this casino will in fact eradicate all the UAIC's cultural and historical ties to

18  the site.

19                  *c.   Community support*

20          Plaintiff UAIC further calls into question the Secretary's determination of no detriment by

21  arguing that the Secretary's finding of community support for Enterprise's proposal was arbitrary

22  and capricious.  (ECF No 98-1 at 16.)  Plaintiff specifies that 52.1% of Yuba County voters

23  rejected the proposal in November 2005.  (ECF No. 98-1 at 16.)  Plaintiff UAIC questions

24  Defendants listing this 2005 vote as the only "local opposition" to Enterprise's proposal.  (ECF

25  No. 98-1 at 16.)  Plaintiff argues that the City of Wheatland, the Wheatland School District Board

26  of Trustees, the Yuba-Sutter Farm Bureau, and the Yuba County Board of Education passed

27  resolutions opposing off-reservation gaming in Yuba County, including Enterprise's proposal.

28  (ECF No. 98-1 at 16.)  Plaintiff UAIC contends that Defendants failed to explain their conclusion

1   that "there is strong local support" for Enterprise's proposal.  (ECF No. 98-1 at 16–17.)

2       Defendants respond first by noting that the popularity of a casino does not by itself

3   indicate whether it is beneficial or detrimental to a community.  (ECF No. 116-1 at 21.)

4   Defendants do admit that the "Department must give weight to the democratically-expressed will

5   of affected voters as one of many factors when considering a tribal application for off-reservation

6   gaming." (ECF No. 116-1 at 21, EN_AR_NEW_0029817.)  However, the Secretary must also

7   give weight to the factors explicitly laid out in the regulations, which include "memoranda of

8   understanding and inter-governmental agreements with affected local governments."  25 C.F.R. §

9   292.18(g).  Defendants argue that these agreements ensure that the gaming projects will occur on

10  terms accepted by the affected local governments.  (ECF No. 116-1 at 22.)  Defendants note that

11  the IGRA ROD provides a list of the State, local governments, and nearby tribes involved in the

12  consultation process and that instead of demonstrating overwhelming opposition, the majority of

13  those involved simply did not respond at all.  (ECF No. 116-1 at 22, EN_AR_NEW_0029811.)

14  Furthermore, Defendants explain that although they did not include a "laundry list of all

15  comments expressing disaffection" in the ROD, this does not mean that they did not take into

16  account opposition to the gaming facility.  (ECF No. 116-1 at 22.)  Defendants argue that they

17  reasonably addressed the fact of such opposition, which is all that was required of them.  (ECF

18  No. 116-1 at 22.)

19      The Court concludes that community opposition was taken into account, however the

20  Court understands that this was just one factor considered by the Secretary and was not

21  dispositive.  Although the entirety of the opposition comments may not have been included in the

22  ROD, even Plaintiff UAIC admits that some of the opposition (in addition to the 2005 vote) was

23  mentioned elsewhere in the ROD.  (ECF No. 98-1 at 16.)  The Court is satisfied that the Secretary

24  took into account the opposition and addressed the opposition in the ROD.  Therefore, the

25  Secretary did not act arbitrarily or capriciously.

26          *4.  Concurrence from the Governor*

27      The record reflects that the Governor of California concurred with the Secretary's

28  determination.  (EN_AR_NEW_0029207.)  However, Plaintiff Citizens contends that the

Secretary violated 25 C.F.R. § 292 by omitting a substantial portion of the record application in what was provided to the Governor.  (ECF No. 99-1 at 15.)  IGRA regulations require "the Secretary [to] send the Governor of the State…[a] copy of the entire application record."  25 C.F.R. § 292.22(b).  This application record should include information regarding environmental impacts and plans for mitigating adverse impacts, including an EIS, EA or other information required by NEPA.  25 C.F.R. § 292.18.  Plaintiff Citizens argues that the record sent to the Governor did not include the EIS itself.  (ECF No. 99-1 at 16.)  Plaintiff Citizens further provides that the Secretary arbitrarily excluded many other documents such as letters that the Governor's Office sent during Governor Schwarzenegger's administration, and a letter from Governor Schwarzenegger expressing concerns.  (ECF No. 99-1 at 16.)  Plaintiff Citizens also mentions various other excluded documents which include letters opposing the project.  (ECF No. 99-1 at 16.)

Defendants respond that the regulations do not require transmittal of the entire administrative record to the Governor, but rather only the "entire application record."  25 C.F.R. § 292.22(b).  That record consists of the materials required in a tribe's application for a Secretarial Determination, 25 C.F.R. §§ 292.16-18, and the materials received as part of the consultation process with State and local officials and nearby Indian tribes, 25 C.F.R. § 292.19.  Those are the only materials the Secretary is required to consider for purposes of the Secretarial Determination.  25 C.F.R. § 292.21(a) ("The Secretary will consider all the information submitted under §§ 292.16-292.19" in making the Secretarial Determination).  *See also Stand Up*, 919 F.Supp.2d at 70-71 (finding unpersuasive that 25 C.F.R. § 292.22(b) requires transmittal of "entire record").  Defendant notes that the record does not indicate whether or not the Final EIS was included among the materials provided, and admits that it should have been transmitted.  However, Defendant claims that if the FEIS was omitted, this error was harmless and there is no cause for a remand.  *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1090-91 (9th Cir. 2014) ("Relief is available under the APA only for 'prejudicial error'") (quoting 5 U.S.C. § 706).

The record reflects that the Governor's Office was at least provided the Draft EIS ("DEIS").  (ECF No. 116-1 at 25.)  The Governor's office provided comments on the DEIS.

23

(EN_AR_NEW_0026089.)  Furthermore, the Secretary's request for the Governor's concurrence with the Secretarial Determination memorialized the basis of the Secretary's decision and, again, repeatedly references the FEIS, relies on it throughout, and often summarizes its findings. (EN_AR_NEW_0029992-30025.)  Therefore, the Governor was well aware of the DEIS and the FEIS, and could have requested the FEIS (assuming its omission) if it was deemed necessary. The Governor ultimately concurred with the Secretary's Determination and found that the "federal administrative process giving rise to [the] determination was extremely thorough . . . . included numerous hearings, considered hundreds of comments, and generated thousands of pages of administrative records."  (EN_AR_NEW_0029207.)  The Governor was well aware of the process, including the preparation of the FEIS.  The Court concludes that if the FEIS was omitted this was unintentional and immaterial to the outcome of the Governor's decision.[5]

As for the other documents that Plaintiff Citizens points to, they do not constitute application materials within IGRA regulations.  Pursuant to 25 C.F.R. § 292.22(b), the "entire application record" must be transmitted, and the Court is unaware of any requirements to transmit documents outside the application record.

## C.  Indian Reorganization Act Claim

The Indian Reorganization Act ("IRA") authorizes the Secretary to acquire land and hold it in trust "for the purpose of providing land for Indians."  25 U.S.C. § 465.  The procedures and policies concerning the Secretary's exercise of discretion for acquiring lands in trust for Indian tribes are set forth in 25 U.S.C § 465 and 25 C.F.R. § 151.

### 1.  Need and Purpose for the Land

The Secretary may acquire land in trust for a Tribe when the acquisition of the land "is necessary to facilitate tribal self-determination, economic development, or Indian housing."  25 C.F.R. § 151.3.  Here, the ROD states that the BIA determined that the acquisition of the 40 acres satisfied 25 C.F.R. § 151.3(a)(3) and that the land is necessary to facilitate tribal self-determination and economic development.  (EN_AR_NEW_0030210.)

---

[5] *Cal. Comtys. Against Toxics v. E.P.A.*, 688 F.3d 989, 993 (9th Cir. 2012) (harmless error in spite of mistake when "a party has actual notice and was able to submit its views to the agency prior to the challenged action").

Plaintiff UAIC and Plaintiff Colusa both allege that Defendants failed to adequately consider and analyze Enterprise's "need" for additional land and "the purpose for which the land will be used" as required by 25 C.F.R. §§ 151.10, 151.11.  (ECF No. 98-1 at 14, ECF No. 102-1 at 16.)  Plaintiff UAIC declares that Enterprise already possessed 40 acres of land in Butte County that could accommodate gaming.  (ECF No. 98-1 at 14.)  Therefore, Plaintiff UAIC argues that Enterprise simply wanted additional land, rather than needed it.  (ECF No. 98-1 at 14.)

In response, Defendants agree that 25 C.F.R. § 151.10 requires the Secretary to consider "[t]he need of the individual Indian or the tribe for additional land."  However, the regulation does not require a justification for why a particular parcel was chosen over other possibilities. *See South Dakota v. U.S. Dep't of Interior*, 423 F.3d 790, 801 (8th Cir. 2005). ("It was sufficient for the Department's analysis [of § 151.10(b)] to express the Tribe's needs and conclude generally that IRA purposes were served.").  The ROD explains that the Tribe has limited landholdings and concludes that the "Tribe needs the subject parcel held in trust in order to better exercise its sovereign responsibility to provide economic development to its tribal citizens." (ECF No. 116-1 at 16, EN_AR_NEW_0030214.)  Although Plaintiffs argue that the Tribe already possessed 40 acres, the Secretary explained in the ROD that this current 40 acres is not sufficient "for tribal housing needs, tribal government or economic development purposes." (EN_AR_NEW_0030214.)

Plaintiff Colusa alleges that although Defendants list housing as one of the reasons this additional land is needed, the DOI acknowledges that the land to be acquired will be used for gaming, not housing.  (ECF No. 102-1 at 17.)  The purpose for the site is described in the ROD as "for recreation/tourism by constructing a casino, hotel and parking structure." (EN_AR_NEW_0030214.)  However, this somewhat mischaracterizes the Secretary's analysis. In the ROD, the Secretary explains that the current 40 acres is not sufficient for housing, tribal government, etc.  The Court understands this to mean that the current land is not big enough to meet all of the tribe's needs, and they need additional land.  Therefore, this does not necessitate that the additional land will actually be used for housing.

In addition, Plaintiff UAIC asserts that the Secretary did not give this land acquisition the

"greater scrutiny" required under 25 C.F.R. § 151.11(b) ("as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition." 25 C.F.R. § 151.11(b).) Plaintiff UAIC states that Enterprise's reservation is located 36 miles from the Yuba Site. (ECF No. 98-1 at 14.) Defendants contend that the Secretary thoroughly considered the anticipated benefits from the acquisition, therefore meeting the "greater scrutiny" requirement. (EN_AR_NEW_0030218.) Defendants further claim that Plaintiff UAIC failed to suggest in what respect the Secretary's consideration is wanting, and that Plaintiff UAIC therefore failed to meet its burden under the APA. *George v. Bay Area Rapid Transit*, 577 F.3d 1005, 1011 (9th Cir. 2009). The Court is not convinced that Defendants failed to give the anticipated benefits the "greater scrutiny" required; therefore the Court finds that Defendants satisfied 25 C.F.R. § 151.11(b).

### 2. The Secretary's Authority Under the IRA to Acquire Land for a "Recognized Indian Tribe Now Under Federal Jurisdiction"

Section 5 of the IRA provides that the "Secretary of the Interior is authorized, in his discretion, to acquire . . . . any interest in lands . . . for the purpose of providing lands for Indians." 25 U.S.C. § 465. Section 19 of the IRA then defines Indians as "all persons of Indian descent who are members of <u>any recognized Indian tribe now under Federal jurisdiction</u>." 25 U.S.C. § 479 (emphasis added). In *Carcieri v. Salazar*, 555 U.S. 379 (2009), the United States Supreme Court explains the definition of "Indian" further and holds that the Secretary's authority to acquire land in trust for Indian tribes pursuant to Section 5 of the IRA is limited "to those members of tribes that were under federal jurisdiction at the time the IRA was enacted.[6]" *Carcieri v. Salazar*, 555 U.S. 379, 391 (2009).

Here, the Secretary determined that Enterprise was "under federal jurisdiction" at the time the IRA was enacted in 1934 based on the fact that in June 1935 the Secretary held a vote among the residents of Enterprise pursuant to Section 18 of the Act. (ECF No. 116-1 at 8.) Section 18 of the IRA provides that the IRA "shall not apply to any reservation wherein a majority of the adult

---

[6] IRA was enacted in 1934. 25 U.S.C. § 465.

1   Indians, voting at a special election duly called by the Secretary of the Interior, shall vote against

2   its application."  25 U.S.C. § 478.  The Secretary reasoned that the calling of a Section 18 election

3   established that the Tribe was under federal jurisdiction for *Carcieri* purposes and therefore gave

4   the Secretary authority to acquire land in trust for the tribe.  (EN_AR_NEW_0030214.)

5           Plaintiff Citizens challenged BIA's reliance on Section 18 of the IRA and argues that the

6   Secretary arbitrarily and capriciously concluded that she had authority to acquire land in trust for

7   Enterprise.  (ECF No. 99-1 at 5.)  Plaintiff Citizens claims that the phrase "recognized Indian

8   tribe now under Federal jurisdiction," 25 U.S.C. § 479, refers to an Indian tribe that is both

9   recognized and under Federal jurisdiction "now" (at the time of the statute's enactment in 1934).

10  (ECF No. 99-1 at 5.)

11          Defendants respond first by pointing out that in *Carcieri*, the majority did not address the

12  phrase "any recognized Indian tribe", but Justice Breyer did in his concurrence.  (ECF No. 116-1

13  at 12.)  Justice Breyer explained that the word "now" modifies "under federal jurisdiction", but

14  does not modify "recognized."  Therefore, he concluded that the IRA "imposes no time limit

15  upon recognition."  *Carcieri*  at 398.  This Court agrees.  Given that the term "now" does not

16  modify the phrase "recognized Indian tribe," there is no requirement that a tribe prove that it was

17  a "recognized" tribe in 1934.  As Justice Breyer noted, "a tribe may have been 'under federal

18  jurisdiction' in 1934 even though the Federal Government did not believe so at the time."  *Id.* at

19  397.  Justice Breyer further expresses that, relying on common rules of grammar, because "now"

20  only modifies the words following it, there is no requirement under the IRA for membership in a

21  "recognized Tribe" as of the time the IRA was enacted.  Defendants contend that there is no

22  doubt that Enterprise is currently a federally recognized tribe.

23          Defendants further argue that the fact that such a vote was held on the Enterprise

24  Rancheria establishes that at the time of the enactment of the IRA, the Secretary regarded the

25  Tribe as "under federal jurisdiction".  (ECF No. 116-1 at 10.)  Furthermore, in 1915 the United

26  States established the Enterprise Rancheria,[7] a type of reservation comprised of land held in trust

27

28

---

[7] Although the ROD does not specifically address whether Enterprise was a "recognized tribe" in 1934 in addressing statutory authority for the trust transfer, the IGRA ROD does explain that "the Tribe has been recognized by the United States since at least April 20, 1915."  (EN_AR_NEW_0029799.)

for the Tribe by the United States, which further demonstrates federal jurisdiction over the Tribe. *See Stand Up*, 919 F. Supp.2d at 68 (describing land acquisition for a band as evidence of the band's status as a Tribe).

Defendants admit in their Motion for Summary Judgment that Plaintiff Citizens were correct that in *Confederated Tribes of Grand Ronde v. Jewell*, 12-cv-849, Dkt. No. 37 at 23 (D.D.C. Nov. 6, 2013) the United States noted that Section 18 votes are conducted by reservation, not by "recognized tribes." (ECF 99-1 at 9.) However, Defendants explain that this does not mean that the definition of "tribe" in Section 19 excludes the Indian residents of a reservation for purposes of the IRA. Instead, it means that the IRA is not limited to only those tribes with reservations. (ECF No. 116-1 at 13.) Defendants contend that recognized tribes without reservations were also subject to the IRA provided they met the definition of Indian in Section 19. (ECF No. 116-1 at 13, U.S. *Grand Ronde* brief at 23 n. 23 ("Groups that fit within the definition of Indian in Section 19 were still eligible to organize under the IRA, despite not being eligible to vote to accept or reject the Act."))

The Defendants' stance is consistent with the Department of the Interior's practice. As explained in the Department's most recent M-Opinion[8]: "tribes that voted whether to opt out of the IRA in the years following enactment (regardless of which way they voted) generally need not make any additional showing that they were under federal jurisdiction in 1934. This is because such evidence unambiguously and conclusively establishes that the United States understood that the particular tribe was under federal jurisdiction in 1934." M-37029 at 20. *See also Shawano County v. Acting Midwest Reg. Dir.*, 53 IBIA 62 (Feb. 28, 2011) (IRA vote dispositive to question of federal jurisdiction). This has also been affirmed by the U.S. District Court for the District of Columbia where the court concluded "it was perfectly reasonable for the Secretary to conclude that any persons voting in an IRA election were . . . . adult 'members of [a] recognized Indian tribe now under Federal jurisdiction.'" *Stand Up*, 919 F.Supp.2d at 67-68.

---

[8] An M-Opinion is a legal opinion issued by the Solicitor that formally institutionalizes the Interior's position on a particular legal issue. *See* Department of the Interior 209 Departmental Manual 3.2A(11). An M-Opinion is binding precedent on the Department of the Interior that may only be overturned by the Solicitor, the Deputy Secretary, or the Secretary. *Id*. While the M-Opinion postdates the ROD challenged here, it does show that the present decision is consistent with the Department's practice.

Finally, Defendants argue that Plaintiff Citizens conflate being a "recognized Indian tribe" under the IRA with being a federally recognized tribe.  (ECF No. 116-1 at 15, ECF No. 99-1 at 11.)  As explained by the Department in M-37209, a "recognized Indian tribe," as used in the IRA, does not equate to federal recognition of an Indian tribe, since "federal recognition" in its modern legal sense post-dated the IRA.  *Id.* at 24.  Instead, the IRA uses the phrase "recognized Indian tribe" in a "cognitive or quasi- anthropological sense."  *Id.* at 25.  *See also Stand Up*, 919 F.Supp.2d at 70 ("Thus, both based on the Secretary's interpretive discussion and the Court's own reading of the statutory language, the Court concludes that the phrase 'recognized Indian tribe' in the IRA refers to recognition in the cognitive or quasi-anthropological sense.").  However, Defendants further explain that Enterprise did appear on the compiled list of federally recognized tribes in 1979.  (ECF No. 116-1 at 15, *see* 44 Fed. Reg. 7235, 7235 (Feb. 6, 1979) (listing "Enterprise Rancheria of Maidu Indians")).  Furthermore, the Secretary concluded that Enterprise had been recognized as of at least April 20, 1915.  (EN_AR_NEW_0029799.)  For these reasons, Defendants contend that Enterprise was federally recognized on or before 1934.  (ECF No. 116-1 at 16.)  The Court agrees with Defendants' analysis.

The Court finds no reason to stray from the Department of the Interior's practice of determining federal jurisdiction.  Following this practice, the fact that a Section 18 election was held here indicates that Enterprise was under federal jurisdiction.  The Court therefore concludes that the Secretary properly determined that she had authority to acquire land in trust for Enterprise under the IRA.

**D.  Clean Air Act Claim**

Plaintiff Citizens allege that the Secretary failed to conduct a conformity determination as required under the Clean Air Act ("CAA").  (ECF No. 99-1 at 17-18, ECF No. 102-1 at 11.)  Section 176(c)(1) of the CAA requires Federal agencies to ensure that their actions "conform" to applicable state implementation plans ("SIPs") for achieving and maintaining the National Ambient Air Quality Standards ("NAAQS") for criteria pollutants.  42 U.S.C. § 7506(c).  Under the regulations, "a conformity determination is required for each criteria pollutant or precursor in a nonattainment or maintenance area caused by a Federal action that would equal or exceed" the

1   rates provided in the regulations.[9]  40 C.F.R. § 93.153(b).

2       Plaintiff Citizens explain that Yuba County is designated a "nonattainment" area for the

3   EPA's 24 hour air quality standard for fine particulate matter (PM2.5).  *See* 40 C.F.R. § 81.305;

4   74 Fed. Reg. 58,688 (Nov. 13, 2009).  The de minimus threshold for PM2.5 is 100 tons per year,

5   40 C.F.R. § 93.153(b), and Plaintiff Citizens avows that the proposed casino is not projected to

6   exceed this.  (ECF No. 99-1 at 18, EN_AR_NEW_0023621.)  However, the EPA has concluded

7   that nitrogen oxides are precursors to the formation of PM2.5.  (ECF No. 99-1 at 18.)  Here,

8   Plaintiff Citizens claims the EIS projects that the proposed casino will exceed the de minimus

9   threshold for nitrogen oxide by 500 % (EN_AR_NEW_0023621) which Plaintiff Citizens argues

10  would trigger the conformity review.  (ECF No. 99-1 at 18.)  Therefore, Plaintiff Citizens

11  suggests that the Secretary should have performed a conformity determination based on nitrogen

12  oxide emissions.  *See* 40 C.F.R. §93.156.  Plaintiff Citizens explains that the Secretary did not

13  perform a conformity determination but instead relied on mitigation measures.  (ECF No. 99-1 at

14  18.)

15      Defendants argue that Plaintiff's claim lacks merit because the applicable emissions from

16  the project fall below the de minimis levels established by the conformity regulations.  (ECF No.

17  116-1 at 48.)  Here, the BIA determined in the FEIS that total unmitigated 2010 NOx emissions

18  associated with the project would be 662.97 pounds per summer day, which is equal to 118.84

19  tons per year.  (ECF No. 116-1 at 48, EN_AR_NEW_0023849).  Defendants explain that the

20  argument that NOx emissions would exceed de minimis levels by 500%, (ECF No. 99-1 at 18), is

21  based on an erroneous comparison of the emission estimates expressed as pounds per summer day

22  (662.97) in the FEIS, (EN_AR_NEW_0023621), with the regulatory de minimis level, which is

23  expressed as tons per year (100), 40 C.F.R. § 93.153(b).

24      Additionally, Defendants assert that total emissions from the project will actually be lower

25  than those calculated in the FEIS.  (ECF No. 116-1 at 50.)  The ROD indicates that mitigation

26  measures have been incorporated into Chapter 2 of the decision to reduce construction emissions

27  _____

28  [9] The regulations provide the rate of 100 tons/ year for NOx in nonattainment areas, and 100 tons/ year of NOx in maintenance areas.  40 C.F.R. § 93.153(b).

1   and traffic congestion emissions so that they are at less than significant levels.  (EN_AR_NEW

2   0030183.)  Defendants claim that the total emissions from the actual project operation will be

3   lower than those calculated in the FEIS because of these mitigation measures.  (ECF No. 116-1 at

4   49.)  The FEIS estimates that the mitigation measures will reduce emissions associated with the

5   project to 25 pounds per day (4.56 tons per year).  (EN_AR_NEW_0023849.)  Defendants further

6   point out that in the cumulative effects analysis in the FEIS, BIA modeled NOx emissions from

7   the project for 2025 as 156.10 pounds per summer day, or 28.5 tons per year.

8   (EN_AR_NEW_0023775.)  Thus, emissions for 2015 would be significantly less than the de

9   minimis threshold of 100 tons per year.  Finally, Defendants argue that due to regulatory changes,

10  stricter standards and improved engine technologies, NOx emissions from mobile sources have

11  decreased.  (ECF No. 116-1 at 50, EN_AR_NEW_23774.)  Therefore, models using more current

12  values would project total unmitigated NOx emissions from the project to be below the de

13  minimis threshold for a conformity determination.  (ECF No. 116-1 at 50,

14  EN_AR_NEW_23774.)

15          The Court notes that Defendants incorrectly state that "the definition of 'indirect

16  emissions' is limited to emissions that occur in the 'same nonattainment or maintenance area' as

17  the federal action."  (ECF No. 116-1 at 49.)  However the regulations define indirect emissions as

18  those that are "caused or initiated…and originate" in the same nonattainment area but "occur" at a

19  different place than the federal action.  40 C.F.R. § 93.152.  Therefore, Defendants are incorrect

20  when stating that only emissions that occur in Yuba County needed to be considered.  The

21  regulations include both direct and indirect emissions, so this would also include emissions that

22  originated in the same area as the federal action, but occur elsewhere.  Therefore, the Court does

23  not find Defendants' argument regarding indirect emissions persuasive.

24          Nevertheless, the Court finds that taking into consideration mitigation measures and more

25  current values, the NOx emissions do not appear to exceed the rates provided in the regulations.

26  Therefore, a conformity determination was not required and the Secretary did not violate the

27  CAA.

28

1

### E.  Legal Description of the Subject Parcel

2      Plaintiff UAIC and Plaintiff Colusa argue that Defendants failed to accurately identify and

3  describe the parcel of land to be taken into trust.  (ECF No. 98-1 at 17, ECF No. 102-1 at 18.)

4  Plaintiff UAIC claims that the December 2012 Notice of Intent ordered the conversion of an 80+

5  acre parcel, not the 40 acre portion that was indicated in Enterprise's application.  (ECF No. 98-1

6  at 17.)  Plaintiff UAIC further provides that the description of the larger parcel appeared multiple

7  times in the Record.  (ECF No. 98-1 at 17.)  Therefore, Plaintiff UAIC alleges that Defendants

8  used two land descriptions interchangeably and permitted Enterprise to do so as well.  (ECF No.

9  98-1 at 17.)  The impacts that would result from taking a 40-acre parcel of land into trust would

10  vary from those of an 80+ acre parcel.  (ECF No. 98-1 at 17.)  Therefore, Plaintiff UAIC asserts

11  that this arbitrary use of different parcel descriptions undermines the reliability of Defendants'

12  analysis.  (ECF No. 98-1 at 17.)  Furthermore, Plaintiff Colusa adds that the two different size

13  descriptions of the parcel would include or exclude riparian habitat and have other environmental

14  consequences.  (ECF No. 102-1 at 18.)

15      Defendants respond that the subject parcel consists of a 40-acre portion of a parcel that in

16  total comprises 82.64 acres.  (ECF No. 116-1 at 30.)  Defendants admit that any reference to an

17  80+ acre parcel was an error.  (ECF No. 116-1 at 30.)  However, they contend that its effect on

18  the administrative process was harmless.  *See California v. U.S. Dep't of the Interior*, 767 F.3d

19  781, 794-95 (9th Cir. 2014) (statement in EIS that it improperly tiered to other documents was

20  plainly accidental and therefore harmless).

21      There is nothing to indicate that this error had any effect on the administrative process.

22  Therefore, the Court deems this reference to a larger parcel to be a simple error which the Court

23  finds does not undermine the reliability of Defendants' analysis.

24

### F.  Administrative Procedure Act Claim

25      Plaintiff UAIC argues that by failing to comply with NEPA and the IGRA, Defendants'

26  actions violated the Administrative Procedure Act ("APA").  As discussed above, the Court is not

27  convinced that Defendants violated NEPA or the IGRA and does not find that Defendants acted

28  arbitrarily or capriciously.  Therefore, the Court finds that Defendants did not violate the APA.

IV.   **CONCLUSION**

The Court hereby GRANTS Defendants' Motion for Summary Judgment (ECF No. 116), and GRANTS Intervenor Defendant's Motion for Summary Judgment (ECF No. 119).  The Court DENIES Plaintiff UAIC's Motion for Summary Judgment (ECF No. 98), Plaintiff Citizens Motion for Summary Judgment (ECF No. 99), and Plaintiff Colusa's Motion for Summary Judgment (ECF No. 102).

Dated:  September 23, 2015

Troy L. Nunley
United States District Judge